LATHAM & WATKINS LLP
  Peter A. Wald (Bar No. 85705)
    *peter.wald@lw.com*
  Marcy C. Priedeman (Bar No. 258505)
    *marcy.priedeman@lw.com*
505 Montgomery Street, Suite 2000
San Francisco, California  94111-6538
Telephone: (415) 391-0600
Facsimile: (415) 395-8095

  R. Peter Durning, Jr. (Bar No. 277968)
    *peter.durning@lw.com*
355 South Grand Avenue, Suite 1000
Los Angeles, CA 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763

Attorneys for Plaintiff
*California Physicians' Service, Inc.
d/b/a Blue Shield of California*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA PHYSICIANS' SERVICE, INC., D/B/A BLUE SHIELD OF CALIFORNIA, a California nonprofit mutual benefit corporation,<br><br>Plaintiff,<br><br>v.<br><br>HEALTHPLAN SERVICES, INC., a Florida corporation, HPH HOLDINGS CORPORATION, a Delaware corporation, HPH-TH HOLDINGS, INC., a Delaware corporation, and HEALTHPLAN HOLDINGS, INC., a Delaware corporation, a Delaware corporation, and JOHN DOE 1 THROUGH 10, whose true names are unknown, inclusive,<br><br>Defendants. | CASE NO. 3:18-cv-3730<br><br>**BLUE SHIELD OF CALIFORNIA'S COMPLAINT FOR**<br><br>**(1) BREACH OF CONTRACT**<br><br>**(2) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING**<br><br>**(3) DECLARATORY RELIEF**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

## PRELIMINARY STATEMENT

1. California Physicians' Service, Inc. ("**Blue Shield**") brings this complaint against HealthPlan Services, Inc. ("**HPS**") for HPS' complete and total failure to meet the contractual promises it made in the parties' Business Process Outsourcing Agreement ("**BPOA**," attached hereto, without certain Schedules, as Exhibit 1).

2. HPS was hired to keep reliable, accurate records of Blue Shield's health plan subscribers, and to use those records to perform billing and other account-management services. HPS promised to perform those tasks with high levels of quality, professionalism, and efficiency – with the skill and results that an industry leader would have provided. But what HPS actually delivered fell far short of that standard, and any reasonable standard by which its performance must be measured.

3. At a basic level, HPS simply failed to do its job. HPS needed to maintain trustworthy account information for Blue Shield's customers, but HPS' data was ever-changing, inconsistent, and flat-out incorrect. HPS also needed to send timely and accurate bills to Blue Shield's customers and process their incoming payments, but failed in those jobs as well. As a result, HPS failed to collect tens of millions of dollars – money that belonged to Blue Shield, and that HPS was hired to collect. Blue Shield spent millions of dollars – and fundamentally, lost the benefit of its bargain under the BPOA – trying to fix HPS' mistakes. And while Blue Shield was trying to clean up the mess that HPS made, Blue Shield discovered a new problem: HPS had been issuing large, unwarranted credits and refunds to customers who had not earned them. This mistake also cost Blue Shield many millions of dollars.

4. In short, HPS failed to maintain the records of Blue Shield's customers with accuracy, failed to collect their bills, and in many cases, collected only part of the bill that was due (by applying an unjustified credit or refund). Tens of millions of dollars that were supposed to be paid to Blue Shield never were. In the meantime, Blue Shield was forced to spring into action – doing HPS' job *for* HPS – to ensure that its customers' accounts were made accurate, and to prevent HPS' ongoing series of errors from negatively impacting their customers' experiences. Those efforts came at significant cost – of Blue Shield's own time, money, and personnel.

5. Blue Shield now brings this action to hold HPS accountable for its failed promises and wholly inadequate performance under the BPOA.

## THE PARTIES

6. Blue Shield is a nonprofit mutual benefit corporation that has provided health coverage to the people of California since 1939.  Blue Shield is incorporated in the State of California and has its principal place of business in San Francisco, California.

7. HPS is a corporation that offers administrative and technological services to health insurance companies.  HPS is incorporated in the State of Florida and has its principal place of business in Tampa, Florida.

8. On information and belief, HPH Holdings Corp., HPH-TH Holdings, Inc., and HealthPlan Holdings, Inc. (collectively, the "**Guarantors**") are parent companies and/or affiliates of HPS, each of which is incorporated in Delaware and has its principal place of business in Tampa, Florida (or has been merged into another Delaware company with its principal place of business in Tampa, Florida).[1]

9. Defendants John Doe 1 through 10 are individuals whose names and addresses of residence are currently unknown, and who are therefore sued here under fictitious names. Plaintiff will seek leave to amend this Complaint after the Doe Defendants' true names have been ascertained.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a).  There is complete diversity between the Plaintiff (a California citizen) and Defendants (citizens of Florida or Delaware), and the amount in controversy exceeds $75,000 (excluding interests and costs).

11. The Defendants have consented to the personal jurisdiction of this Court, and to the laying of venue in this district.  *See* Exh. 1 at § 29.2 and Sched. O § 11.  In addition, "a substantial part of the events or omissions giving rise to [Blue Shield's] claim occurred" in this district.  *See* 28 U.S.C. § 1391(b)(2).

---

[1] The Guarantors' obligations to Blue Shield survive any merger.  *See* Exh. 1 at §§ 3, 8.

## FACTUAL BACKGROUND

**The Covered California Health Exchange and the Parties' Entry into the BPOA**

12. Beginning in 2010, in response to new federal and state laws, California authorities worked to create a health exchange – a one-stop shop where private individuals could purchase quality health care plans at affordable prices for themselves and their families – which came to be known as "**Covered California**." Covered California operates like a marketplace or shopping center where the only product is health coverage. Through the Covered California website, Californians can shop for a health insurance or health care service plan that meets their needs by comparing various plans that meet the quality, pricing, and other requirements set by law and regulation.

13. Through Covered California, consumers can sign up for new plans, or renew their existing plans, during a period known as "**Open Enrollment**."[2] Covered California usually conducts Open Enrollment from November through January, but its first Open Enrollment extended from October 2013 into April 2014. Blue Shield began offering health insurance plans through Covered California from its very first Open Enrollment period.

14. In industry terms, the plans available through Covered California are known as "**IFP**" or "**Individual and Family Plans**."[3] One of the primary reasons for the creation of Covered California was to expand the number of people with health coverage by making IFPs more affordable and desirable. Blue Shield therefore expected that its volume of IFP customers would expand significantly once Covered California became operational – and it ultimately did.

15. But in anticipation of that increase in customer volume, Blue Shield foresaw a number of logistical and administrative challenges. The health insurance industry is subject to heavy regulation and oversight at the state and federal levels, and requires a number of special systems, methods, and processes to manage large amounts of subscriber data (including payment information, personal information, and confidential medical data), which must be done with a

---

[2]   Outside of Open Enrollment, consumers can also sign up for new plans or renew existing plans during designated "**Special Enrollment Periods**."

[3]   Covered California also offers certain non-IFP plans (for example, plans for small businesses), which are not at issue in this case.

ATTORNEYS AT LAW
SAN FRANCISCO

3

COMPLAINT

1  high degree of accuracy and reliability.  The changes to the individual market in 2014 included
2  implementation of new eligibility requirements, payment grace periods, and premium credits, as
3  well as coordination with a new entity – Covered California.  Although Blue Shield already had
4  many – but not all – of those systems, methods, and processes in place for its existing subscribers
5  and health plans, it would have entailed material costs to adapt the systems, methods, and
6  processes it had to the new IFP plans, as well as the requirements of Covered California.
7  Moreover, health plans faced a compressed time frame for meeting the evolving requirements
8  applicable to the individual market in 2014.

9    16. As a result, Blue Shield decided against "insourcing" those tasks, and instead sought the help of a separate company that could provide the logistical and administrative systems, methods, and processes that were needed for Blue Shield's new IFP plans.  Florida-based HPS claimed to be that company, a "**Business Process Outsourcing**" specialist with the right skills, experience, and personnel to maintain secure, accurate, and reliable data for Blue Shield's new IFP customers, on and off the Covered California exchange.  Based in part on these and other representations, the parties began negotiating a contract for HPS to provide Blue Shield with Business Process Outsourcing services – culminating in the BPOA.

### The BPOA and its Terms

17. In the BPOA, HPS agreed to perform a number of "**Services**" that included:

    a.  Loading and maintaining accurate data about Blue Shield's health plans on the Covered California website;

    b.  Processing and managing sign-ups, renewals, or terminations of Blue Shield's customers (during Open Enrollment, and throughout the year as needed);

    c.  Generating and distributing bills to Blue Shield's customers;

    d.  Collecting and processing payments, or managing delinquent payments, from Blue Shield's customers;

    e.  Reconciling conflicting financial data regarding Blue Shield's customers or their payments; and

f. Providing Blue Shield with a "help desk" that would remain available to resolve any issues with HPS' work.

See Exh. 1, Scheds. A-1, A-2.

18. Because Blue Shield must bill its customers accurately, the BPOA required HPS to perform its Services at a high level, like the expert vendor that it claimed to be.  Through a number of provisions, the BPOA imposed strong performance obligations on HPS, including:

  a. **High-Quality Services**.  HPS promised "to perform the Services … in a professional and workmanlike manner, consistent with high industry standards, and with at least the same degree of quality and efficiency as well-managed service providers providing services similar to the Services[.]" Exh. 1 at § 24.1.9. HPS was also required to follow "good quality practices followed by the leading providers of similar services." Id. § 5.11.6.

  b. **Perfect Deliverables**.  The BPOA recognized that HPS would be required, from time to time, to produce "**Deliverables**" – "any work product produced in the course of performing the Services … in order to satisfy an obligation of [HPS] under [the BPOA]."  Exh. 1, Sched. V.  HPS promised that each Deliverable would not deviate "in any material respect" from its requirements and specifications for at least a 180-day period after its delivery to and acceptance by Blue Shield.  Id. §§ 24.1.17, 24.1.17.1.

  c. **Automatic Refund of Service Level Credits**.  HPS promised to provide Services at specific levels of quality and quantity, which the BPOA calls "**Service Levels**." Exh. 1 at §§ 5.4, 11.1, Sched. B.  Whenever HPS failed to achieve a certain Service Level, HPS was required to compensate Blue Shield for the resulting losses automatically, by applying a "**Service Level Credit**" to its future invoices to Blue Shield.  Id. Sched. B § 3.2(b).

  d. **Internal Controls for Accurate Transaction Records**.  HPS promised to "maintain a system of internal controls sufficient to provide reasonable assurances

that … [Blue Shield] transactions are executed in accordance with its management's general or specific authorizations[.]" Exh. 1 at § 24.1.12.

    e. **Personnel Standards**. HPS promised to "use sufficient numbers of personnel to perform the Services" required by the BPOA, and that "each person assigned to the [Blue Shield] account shall have an appropriate degree of training, experience, and skill to perform the tasks assigned to such person[.]" Exh. 1 at § 24.1.8. HPS also promised to use "Commercially Reasonable Efforts to keep the turnover rate of [its personnel] primarily working on the [Blue Shield] account as low as reasonably possible[.]" *Id.* § 6.2.2.

    f. **The Parental Guaranty**. For extra protection against any failure by HPS to meet its commitments, Blue Shield also required the Guarantors to sign Schedule O of the BPOA – the "**Parental Guaranty**." Under the Parental Guaranty, the Guarantors agreed to make "prompt payment when due of all amounts payable by [HPS] pursuant to the [BPOA] …. [i]n the event [HPS] for any reason does not or is unable to perform any Obligation in accordance with the [BPOA][.]" Exh. 1 at Sched. O §§ 1-2.

19. Through these and other provisions, the BPOA placed stringent requirements on HPS to maintain records, bill customers, and perform other Services with reliability and accuracy. Unfortunately, as detailed below, HPS utterly failed to meet these obligations, and its conduct was an extreme departure from the level of quality it promised to provide.

## HPS Failed to Meet Its Obligations

20. Beginning in 2014 and extending through the present, HPS has repeatedly failed to perform the Services required by the BPOA, or failed to perform them according to the "high industry standards" required by the BPOA. *See* Exh. 1 at § 24.1.9. At the heart of those failures is HPS' inability to maintain customer data that is consistently and reliably accurate. Although Blue Shield consistently and effectively took steps to shield its customers from the consequences of HPS' shortcomings, Blue Shield itself nevertheless incurred significant damages in the following broad categories.

a. ***HPS Failed to Collect Payments***.  One of HPS' most basic obligations under the BPOA was to receive, process, apply, record, and otherwise manage the payments made by Blue Shield's customers – tasks which the BPOA refers to as "**Accounts Receivable and Collection Services**." Exh. 1, Scheds. A-1, A-2.  But HPS' inaccurate and unreliable records, its inaccurate bills (or simple failure to send bills as required), and its overall incompetence caused major parts of the Accounts Receivable and Collection Services to go unperformed.  Through these failures, HPS caused Blue Shield to write off more than $20 million in revenue that HPS was hired to collect.

b. ***HPS Mismanaged Customer Refunds and Credits***.  As part of the Accounts Receivable and Collection Services, HPS was required to process any refunds or credits to which a Blue Shield customer was entitled.  For example, when a customer pays more than he or she is required to pay, Blue Shield's policy is to apply the overage as a "**credit**" that reduces that customer's next bill, or in some cases, pay the customer a "**refund**" directly.  Under the BPOA, HPS was responsible for implementing that policy – but it consistently failed to do so accurately, and failed to develop or maintain the internal controls needed to ensure accurate implementation.  *See* Exh. 1 at § 24.1.12, Scheds. A-1, A-2. HPS' failures were so egregious that, beginning in 2016, Blue Shield started performing individual reviews and approvals of all refunds that HPS proposed over a certain amount – in essence, doing *HPS'* work for HPS.  The results of Blue Shield's review showed that HPS' Services were barely better than a coin toss: in nearly half of the cases Blue Shield has reviewed since 2016, HPS proposed a refund or a credit that was excessive, or had no basis at all.  HPS' large error rate means that Blue

Shield has lost tens of millions of dollars due to excessive or baseless refunds approved by HPS.

    c. ***HPS Failed to Process Service Level Credits***.  As noted above, HPS was required to apply Service Level Credits to Blue Shield's account automatically whenever HPS' performance fell short of a certain threshold.  Exh. 1, Sched. B § 3.2(b).  But HPS never did so, and as a result, charged Blue Shield millions of dollars that Blue Shield never should have had to pay.

    d. ***Blue Shield Had to Help HPS Fix Its Own Data***.  In or around mid-June 2014, when Blue Shield began to realize the depth of HPS' shortcomings, it created a new team of people at Blue Shield whose sole job was to address the failures in HPS' Services to ensure that Blue Shield's customers' interests were not impacted.  The work of that Blue Shield team has continued since 2014, during which time the team has discovered (and worked to correct) more and more problems with HPS' Services.  In all, Blue Shield has been forced to spend millions of dollars in its own direct labor costs to support HPS – in the work HPS was hired to do.

21. The categories listed above are not an exhaustive or complete list of HPS' failures to perform the Accounts Receivable and Collection Services (or the Services, more broadly) required by the BPOA.  However, these categories on their own demonstrate that by any measure, HPS' failures were egregious, and have caused Blue Shield to forego tens of millions of dollars in revenue to which Blue Shield was entitled.

22. In many cases, HPS' failures have raised serious questions about HPS' ability to do its work, which in turn has forced Blue Shield to dedicate substantial resources to oversee and correct HPS so that customers' interests would not be impacted.  For example:

    a. In October and November 2015, HPS issued a correction or adjustment to Blue Shield's customers' data with a cumulative effect of approximately $35 million.  Although it is common for some of the customer data to

undergo a correction or adjustment from month to month, HPS' $35 million adjustment was several times higher than the typical monthly adjustment, which was in the low millions. This error (which was in itself the result of many different failures on HPS' part) cost Blue Shield substantially through the time, money, and resources needed to ensure that its customers were not impacted.

b. HPS caused numerous payment irregularities (or allowed them to occur, through its poor oversight), including a remarkable incident in which a series of transactions occurred between a Friday night and the following Monday morning, resulting in approximately 14,000 customers having multiple attempted charges on their bank accounts over the course of the weekend. Incidents such as this underscored the need for Blue Shield to continue closely monitoring HPS' work to ensure that Blue Shield's customers were not impacted.

c. Blue Shield's emails escalating critical issues for resolution by HPS were returned as "undeliverable."

d. Failures in HPS' email system made it impossible for HPS to receive applications for health coverage from potential customers online. As a result, Blue Shield was required to send potential customers' applications to HPS by fax or FedEx for a period of weeks (during Open Enrollment, a critical time for signing up potential customers).

e. HPS sent large refunds (including, in one instance, a $27,000 refund) to the wrong customers.

f. HPS misapplied an important tax credit for Blue Shield's customers on Covered California for a period of months – without telling Blue Shield.

g. HPS repeatedly failed to close out issues that required resolution on the running project list and issue tracker exchanged between Blue Shield and HPS. HPS either did not resolve many of those issues, or resolved them

only after repeated follow-up and requests from Blue Shield. In addition, HPS repeatedly failed to employ reliable or stable workarounds to many of HPS' failures in functionality.

23. The cumulative effect of HPS' errors demonstrates that HPS failed to devote even a scant level of care to its contractual obligations. Faced with these and other ongoing issues – and a continuing and expanding array of performance failures over the course of 2014 and beyond – Blue Shield concluded that it could no longer rely on HPS for the Services that HPS had promised to provide. But determining the next step was no easy task, for two reasons. First, the challenge of insourcing the necessary systems, methods, and processes (*i.e.*, the reason Blue Shield had hired HPS in the first place) remained substantial – both in the time and cost required. Second, the fact that HPS was already recording and administering all of Blue Shield's IFP customer account data added additional layers of difficulty, because Blue Shield had to ensure that any changes to its systems, methods, and processes did not negatively impact the data that HPS was attempting to manage in real-time.

24. In other words, to replace HPS, Blue Shield not only had to find a new partner, but also had to switch partners without slowing down or disrupting the existing and substantial customer volume that HPS had been (mis)handling. To accomplish that difficult transition would require more time, and to that end, Blue Shield extended the BPOA from its automatic termination date of December 31, 2016 to December 31, 2017. However, by April 28, 2017, Blue Shield had made sufficient progress in its transition plan to allow it to initiate a termination of HPS for cause – and Blue Shield did so (though the BPOA requires HPS to assist Blue Shield in transitioning the Services away from HPS following its termination). Blue Shield now brings this Complaint to recover all damages due from HPS' failure to meet its obligations.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Breach of Contract

### (Against HPS)

25. Blue Shield repeats and re-alleges the foregoing paragraphs 1 through 24 above as though fully set forth herein.

26. Blue Shield and HPS entered into a valid contract (the BPOA).

27. Blue Shield fully performed its obligations to HPS under the BPOA, including by making required payments to HPS. To the extent any of Blue Shield's obligations may have been unperformed, its performance was excused.

28. HPS has breached the BPOA on numerous occasions, as set forth above.

29. HPS' breaches of contract have caused Blue Shield to incur significant damages, in an amount to be determined at trial.

### SECOND CLAIM FOR RELIEF

### Breach of the Implied Covenant of Good Faith and Fair Dealing

### (Against HPS)

30. Blue Shield repeats and re-alleges the foregoing paragraphs 1 through 29 above as though fully set forth herein.

31. Blue Shield and HPS entered into a valid contract (the BPOA), and a covenant of good faith and fair dealing is implied by law into that contract.

32. Blue Shield fully performed its obligations to HPS under the BPOA, including by making required payments to HPS. To the extent any of Blue Shield's obligations may have been unperformed, its performance was excused.

33. HPS unfairly interfered with Blue Shield's rights to receive the benefits of the BPOA, as set forth above. As a result, HPS has breached the covenant of good faith and fair dealing that is implied by law into the BPOA.

34. HPS' breaches of the implied covenant of good faith and fair dealing have caused Blue Shield to incur significant damages, in an amount to be determined at trial.

## THIRD CLAIM FOR RELIEF

### Declaratory Relief

### (Against all Defendants)

35. Blue Shield repeats and re-alleges the foregoing paragraphs 1 through 34 above as though fully set forth herein.

36. An actual controversy exists between Blue Shield and the Defendants regarding their respective rights and obligations under the BPOA. Blue Shield contends that the Guarantors are liable for any sums awarded to Blue Shield in this action that HPS does not pay. On information and belief, the Defendants disagree with Blue Shield's position.

37. A judicial declaration is necessary and proper at this time under the circumstances so that Blue Shield may ascertain its rights under the BPOA and the Parental Guaranty. In the absence of a judicial declaration, Blue Shield may be put to the unnecessary and wasteful burden of seeking satisfaction of the Parental Guaranty in a separate legal proceeding.

38. Pursuant to Section 11 of the Parental Guaranty, the Guarantors are liable for "all reasonable attorney's fees and disbursements and all other reasonable and actual costs and expenses which may be incurred by [Blue Shield] in the enforcement of this Parental Guaranty."

## **PRAYER FOR RELIEF**

WHEREFORE, Blue Shield prays for the following relief:

1. For compensatory damages in an amount to be proven at trial, but in no event less than the losses actually caused by HPS' wrongful conduct;

2. For a judicial declaration that the Guarantors are liable for any sums awarded to Blue Shield in this action that HPS does not pay;

3. Costs of suit incurred herein;

4. All reasonable attorney's fees, disbursements, and other reasonable costs and expenses incurred by Blue Shield in the enforcement of the Parental Guaranty;

5. Any and all other relief that the Court deems just and proper.

Dated:  June 22, 2018

Respectfully submitted,

LATHAM & WATKINS LLP
    Peter A. Wald
    Marcy C. Priedeman
    R. Peter Durning, Jr.

By /s/ Peter A. Wald
    Peter A. Wald
    Attorneys for Plaintiff
    *California Physicians' Service, Inc.*
    *d/b/a Blue Shield of California*

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Dated:  June 22, 2018                              Respectfully submitted,

                                                                  LATHAM & WATKINS LLP
                                                                      Peter A. Wald
                                                                      Marcy C. Priedeman
                                                                      R. Peter Durning, Jr.

                                                            By /s/ Peter A. Wald
                                                                    Peter A. Wald
                                                                    Attorneys for Plaintiff
                                                                    *California Physicians' Service, Inc.*
                                                                    *d/b/a Blue Shield of California*